### 11695. OGLESBEE *v.* THE STATE.

The extraordinary motion for a new trial was properly overruled.

(a) Before a new trial should be granted upon alleged newly discovered evidence it should be such as, if believed, would probably produce a different verdict upon another trial, such evidence as would be "decisive of the controversy."

(*b*) " The extraordinary motions or cases contemplated by the statute are such as do not ordinarily occur in the transaction of human affairs, as when a man has been convicted of murder, and it afterwards appears that the supposed deceased is still alive, or where one is convicted on the testimony of a witness who is subsequently found guilty of perjury in giving that testimony, or where there has been some providential cause, and cases of like character." *Cox* v. *Hillyer*, 65 *Ga.* 57 (2).

DECIDED NOVEMBER 9, 1920.

Conviction of manslaughter; from Tattnall superior court — Judge Sheppard. June 3, 1920.

The plaintiff in error was indicted and tried for murder and was found guilty of voluntary manslaughter. His motion for a new trial was overruled, and the judgment was affirmed by this court. See 24 *Ga. App.* 276 (101 S. E. 722). Thereafter, at the January adjourned term, 1920, of the trial court he filed an extraordinary motion for a new trial on the ground of newly discovered evidence. The record shows that the homicide took place at night in a public road near a creek and in the presence of two persons, both of whom were witnesses at the trial. The alleged newly discovered evidence is contained in the joint affidavit of R. W. Geiger and G. C. Coley, which is as follows: " That they are both white men and now reside in said county, and have lived there nearly all their lives; that on the night of August 23, 1918, they were in Glennville, in said county, and that, as they now recall, this was on Friday night of the week, and both of them lived north of Glennville and upon or near the road going to Hagan; that a short while after dark they were going up toward their home and crossing one prong of Beard's Creek and known as the Jack DeLoach crossing; that just as they walked off the bridge on the north side of said creek they heard some loud cursing between there and the home of Mans Bell and near his yard. It seemed to be the voices of two men, and they seemed to be fussing about some whisky and a pocket-book. Soon this loud talking hushed, and we went on going north on the road toward Hagan, and when about 200 yards from said bridge we suddenly saw two men and two women coming towards us, with the smaller man and the larger woman walking ahead, and the larger man and a small girl walking behind. The man and the woman were disputing about some money and a pocket-book, and the man was accusing the woman

of taking $30 from him. The little girl behind said to the man with her, 'Don't let him hurt Tinnie.' The large man behind said, 'Let me get to the damn son of a bitch,' and went toward him. We were back in the road about ten steps from them when this second row started, and we stepped behind some bushes, hoping that the two men and two women would go on by us. The large man rushed on the smaller man and grabbed him in his shirt with his left hand and threw his right hand around the other man's neck. It was a bright moonlight night, and from where we were we could not. see if he had anything in his right hand. At once the men fell and the girls ran, and in a minute or two the small man got up and passed by us and went on towards Glennville, and the other man lay on the ground as if he were dead. At this time the girls were nearly to the house where Mans Bell lived. This was on one of the main public roads of the county, and we were afraid to go to the dead man beside the road and be found there with him dead. We quietly went round and went on our journey above there and upon the Hagan road where we had started. Knowing both Weathers and Oglesbee well, we thought they were the parties, and later learned this was true. At the moment of the killing we were afraid to go to the dead man, and having acted as we' did we did not care to be connected with the matter and be carried to court. From what we saw we knew the man that did the killing was justified, and we soon learned that he was turned out of jail under a small bond. We believed he would be turned loose by the jury, and we kept our mouths shut. Later we learned Oglesbee had been convicted of voluntary manslaughter and sentenced to eight years; then we heard he had moved for a new trial and would get one. We have just learned that the high court in Atlanta has decided against him and that he must go to the chain-gang eight years. We cannot remain silent any longer, and we hunted up the lawyer for Oglesbee, H. H. Elders, and told about it. This affidavit is made to be used in the hearing of an extraordinary motion for a new trial in this matter."

In the counter-showing made by the State, Tal Durrence makes affidavit that " he saw the said Geiger some time about Christmas, 1919, at the home of deponent in said county, and had a conversation with him concerning the above-stated case, and that during said conversation the said Geiger told deponent in substance that

he was in Brunswick, Ga., at the time of the killing of Weathers by the defendant Oglesbee, and that his first knowledge of the occurrence came to him through the newspaper; that he and Oglesbee had always been good friends, and that Oglesbee had tried to get him to help him get a new trial, and had endeavored to get him to go and see Tinnie Murray and get her to change her testimony." The aunt of Coley swears that his character is bad, and that "on several occasions she has heard him talk about the killing of Hamp Weathers, and has heard him say many times that he knew absolutely nothing of the killing; that at her home just a few days prior to this date, when asked if he had signed an affidavit that he saw the killing of Oglesbee, or if he had signed any affidavit at all, he said that he had not, that he didn't know anything about it, and had made no affidavit; that they had him up to Reidsville and asked him about whether he knew Hamp Weathers, and he replied that he did, and then whether he knew Oglesbee, and he replied that he did not, and then as to whether or not he knew anything about the killing, and that he told them that he did not know anything about it, and that he refused to make any affidavit concerning it." Another person also swears to the bad character of Coley. The record contains a second affidavit made by Coley, in which he repudiates his first affidavit and says, that "he was not present at the place when the killing was done, and knew nothing about it until the day after Weathers was killed; that he knows nothing about said murder case except what he has heard; that he has signed an affidavit in this matter before, and understood that affidavit was only to the effect that he knew Hamp Weathers and Robert Oglesbee; that he cannot read nor write." Coley made another affidavit, in which he denied making the second one, but reaffirmed the statements made in his first, and denied the statements attributed to him by his aunt. A second affidavit made by Geiger denied that he had ever made the statement attributed to him in the affidavit of Durrence. There were also affidavits as to the good character of Geiger and Coley, and as to the bad character of the aunt of Coley.

*Elders & DeLoach,* for plaintiff in error.

*J. Saxton Daniel, solicitor-general,* contra.

BLOODWORTH, J. (After stating the foregoing facts.) Motions for new trials on extraordinary grounds are not favored by the courts, and "a stricter rule is applied to an extraordinary motion

for new trial based on the ground of newly discovered evidence than to an ordinary motion on that ground." *Norman* v. *Goode,* 121 *Ga.* 449, 455 (49 S. E. 268). Even in an ordinary motion for a new trial based upon newly discovered evidence it has been uniformly held that "though the witness sought to be impeached by newly discovered evidence was the only witness against the prisoner upon a vital point in the case, if the sole effect of the evidence would be to impeach the witness a new trial would not be granted." *Key* v. *State,* 21 *Ga. App.* 795 (101 S. E. 917), and cases cited.

The only effect of the alleged newly discovered evidence in this case would be to impeach the two witnesses who were sworn for the State at the trial. In addition to this, the alleged newly discovered evidence is of such a character that even if unattacked, it would hardly be received as credible by the average juror. Before a new trial should be granted upon alleged newly discovered evidence it should be such as, if believed, would probably produce a different verdict upon another trial, such evidence as would be "decisive of the controversy." It can hardly be insisted that the evidence of Geiger and Coley is of this character. Moreover, it is now the fixed law of this State that "the extraordinary motions or cases contemplated by the statute are such as do not ordinarily occur in the transaction of human affairs; as, when a man has been convicted of murder and it afterwards appears that the supposed deceased is still alive, or where one is convicted on the testimony of a witness who is subsequently found guilty of perjury in giving that testimony, or where there has been some providential cause, and cases of like character." *Rogers* v. *State,* 18 *Ga. App.* 702 (90 S. E. 356), and cases cited. The motion under consideration does not come within this rule. The extraordinary motion for a new trial was properly overruled.

*Judgment affirmed. Broyles, C. J., and Luke, J., concur.*